Case number 152413 Baker Hughes Incorporated and others versus S&S Chemical LLC and others. Arguments not to exceed 50%. Mr. Centner for the appellants. Good morning. Good morning. May it please the court. My name is David Centner. I represent Baker Hughes and Baker Petrolite. Are you reserving any time for rebuttal? I'm not, Your Honor. I'm not, Your Honor. Thank you. I appear here on behalf of the plaintiffs in the trial court, the appellants before this court. Since the parties weren't provided oral argument in the trial court, I very much appreciate the opportunity to be here today and have oral argument. In this trial court summary judgment decision. The three main points that I want to touch on today are number one, the summary judgment standard under Rule 56. Number two, the critical issue of whether or not there was a meeting of the minds or mutual assent between the parties with respect to a particular written proposed settlement agreement that was exchanged between the parties during settlement negotiations. And that was an agreement exchanged by counsel. And number three, whether or not the trial court properly allowed certain outcome determinative evidence, specifically the declaration of Mr. Giles, whether that was appropriately considered since Mr. Giles was never disclosed pursuant to Rule 26a1. So let me speak first to the burden of proof and I know the court is well aware of the standard under Rule 56. I want to just touch on a couple points. Number one, under Anderson v. Liberty Lobby, the standard whether or not the evidence is so one-sided that a party must prevail as a matter of law. The second thing under Matsushita is the district court must construe all reasonable inferences in favor of the non-moving party. Now I understand the court knows those standards and in fact it cited them in pages 6 and 7 of the trial court opinion. But we submit that those standards were then misapplied because the evidence is not so one-sided that one party must prevail as a matter of law. And we submit that all reasonable inferences were not drawn in favor of the plaintiffs, the non-moving party. We also... The law that applies here though, everyone is in agreement that it's Oklahoma law, correct? That's correct, Your Honor. Which frames how we determine the summary judgment standard, correct? It does, Your Honor. And under Oklahoma law pursuant to the Brewer v. Seminole decision on the issue of mutual assent, the standard is unqualified acceptance of the terms and that's in our briefing. Also the question of whether or not there was a meeting of the minds under Oklahoma law is a LLC v. City of Blackwell decision that we cited. That's a Tenth Circuit decision quoting Gomez v. Hamid, which is a 2008 Oklahoma decision. So talking about mutual assent, the trial court concluded that yes, the parties reached an agreement. They reached a meeting of the minds on April 7, 2000. And that was with respect to a specific draft of a proposed settlement agreement that had been exchanged by the party's lawyers. But it was sent by your client, correct? Yes, it was. A draft was sent to opposing counsel. On March 30, right, of 2000? That's correct, Your Honor. And it was signed the next day by Giles and Stevens? Well, I'm not sure when it was signed, but it was certainly sent back on April 7. Sent back on March 31st to your client, right? I think it was returned on April 7, Your Honor. On April 7, excuse me, right. Yes. But was there any change from what your client Baker sent to Stevens on March 30? No, there were no changes to that proposal. And then, pursuant, after April 7, I gather the settlement was effected. I mean, your client Baker paid him $10,000, right? Well, we certainly paid $10,000. And the lawsuit by Stevens was dismissed with prejudice against Baker? It was, Your Honor. That was the basic terms of the settlement, was it not? Well, as we see the facts, Your Honor, there was an agreement. And we know when an agreement was reached between the parties. And that was actually earlier. That was on January 20th. Because Mr. Giles' billing records reflect that on January 20th, the parties reached a settlement, and Mr. Giles informed the Oklahoma Federal Court that the case had been settled. But you can, don't parties often reach a settlement in principle and even report the settlement in principle to a court, but define the particular terms by the writing that follows? I agree, Your Honor. So, here you have a document sent by your client that is the writing that follows with the particulars of the agreement. Yes, Your Honor. So, you send it as an offer. You tell the court, we've reached an agreement in principle. You can take us off your trial list or whatever. You can reschedule. And then you draft a document and you send it to the opposing party, which in practical reality, isn't that an offer of the final terms that evidence the agreement in principle from earlier in the year? Absolutely, it could be. Yes. And then the other party takes it, signs it, and sends it back to you. Why is that not an acceptance at law? Well, if there's certainly a signature by both sides, I would agree that you have a binding contract. The question for you is, who made the offer and who made the acceptance? If you send the offer, signed or unsigned, it is in fact at law, isn't it? An offer from you of resolution. And doesn't it then become effective upon signature of the recipient? I would submit that it could be, but I think there are... Why not here then? Well, there are a number of factual issues. Number one is the January 20th agreement that, hey, we're going to pay $10,000 and we're going to dismiss the lawsuit. The agreement in principle. Yes, but there was never any discussion of a release. There's no evidence in the record that a release or a general release or extremely broad release was going to be part of the party's deal. But if you sent it, why isn't that then your offer of what is part of the party's deal? Again, I think it could be, but no one testified. There was no evidence in the record that, for example, either Baker Hughes or Baker Petrolite agreed to those terms. Baker Hughes wasn't even on the agreement in terms of a signature block. And who represented both of those parties? Mr. Brossard, the attorney. Yes, I understand that. So can a party recipient of an offer not rely on the fact that counsel acts on behalf of the parties represented? I would say sometimes, yes. And why not here? Well, number one, there's an issue, we think, in the evidentiary record regarding whether it was a final offer. Because Mr. Giles' billing records reflect that even after April 7, that he's either negotiating or not sure that there was a final agreement, final terms. April 7, in his billing records, he says review and approve last changes to the release. If an agreement was reached, as the trial court ruled prior to that, or as Mr. Giles declared in his declaration, that an agreement was made back at the end of March, then why a week later is he wondering whether they're approving last changes? We don't know what last changes. Anything in the record that contests Giles' affidavit regarding what his services were, do you? No, but that gets to the shifting burden under Celotex. And we submit that, and this gets to Rule 26, so why don't I speak to that, Your Honor? Well, I'm sorry. What is it that you contend happened? I mean, I hear a lot of, well, this isn't there, that isn't there. What is it that, what is the basis of, I mean, is there some overall construct that you're putting forward? We don't believe that a release was ever agreed to by Baker Hughes or Baker Petrolite. We know, based on the record, that the— So are you saying that, I'm sorry, who was handling it from your side? Mr. Broussard was— Okay, are you saying that Mr. Broussard put a release in there by mistake, or used a standard form, or somehow or other inserted something that the parties had not agreed to? I think that's very likely, and we don't know based on the evidentiary record. I think that's a genuine issue of material fact. We know that the agreement was sent to Mr. Stevens' counsel. Mr. Stevens and Mr. Stevens' counsel signed it, and then it went to Mr. Broussard by fax, that's in the record, and then it was faxed by Mr. Broussard to Baker Petrolite, and then never signed. It went to in-house counsel. After it went back, that's when the deal was carried out, the $10,000 was paid by Baker to Stevens, and they dismissed the lawsuit with prejudice, right? The check was cut on April 4, Your Honor, prior to that. And the agreement to pay $10,000 was made back in January. When was the check mailed to Stevens? We know that it was received on April 18. Okay, so it was after April 7. I would agree that April 18 is after April 7. So from a legal standpoint, I'm trying to understand the argument. Is it a mistake? Because I just don't see what else is there. The issue is whether or not there was a meeting of the minds between Baker Hughes, Baker Petrolite, on the terms of the release. We know it was in a proposed agreement. We don't know whether my clients ever agreed to that. They certainly agreed to pay $10,000. I'm sorry. I understand there's a wrinkle of your clients. There's the problem that it wasn't signed. But assuming that Mr. Bersod acted for your clients, okay, I'm still trying to figure out you have a problem, which is that you have a document that has a release that came from your office and was signed by the other side. Yes, Your Honor. And so I'm trying to get at the legal, what is your legal approach to the fact that the document that was sent from your client had a release in it? The reason we're at this point, Your Honor, really gets back to the only evidence in front of the trial court, in front of this court, comes from Mr. Giles. And because of their failure to disclose Mr. Giles under Rule 26A1 . . . But no, it doesn't come from Mr. Giles. It comes from a document. That's the strongest piece of evidence. Now, after the document, the strongest evidence, the most reliable evidence would come from the lawyers who were negotiating. Now, do we have anything from somebody from your client that was negotiating? Are there any affidavits from Mr. Bersod? Because this issue came up so late in the game. It was not disclosed as an affirmative defense in response to the complaint or the First Amendment complaint. It first showed up on May 11th, which was six months after discovery started. And Mr. Giles . . . But you didn't provide the document to him until what, toward the end of discovery? It was discovered among tens of thousands of documents, yes. But wasn't there a motion? I'm sorry. Wasn't there a motion? I mean, weren't you responding to a motion based on a release? Certainly. They filed a motion. That's why we're here. So why wouldn't . . . If the document was invalid . . . I mean, ultimately, they're relying on a document. If the document is subject to some challenge, whether there was a boilerplate clause put in by mistake, or, yeah, this is the signed one, but it's not the final one, or there was a discussion that shed light on it, I mean, why wouldn't any of that be in the response to the motion for summary judgment? Because of the position we were put in by failing to disclose Mr. Giles. The first time we saw anything from him was in his declaration on summary judgment. We had an unsigned agreement that my client says they never agreed to. Is Mr. Bouchard still around? Yeah, but I don't think he has any recollection of 16 years ago. But you could have taken Mr. Giles' deposition, couldn't you? Discovery was still open. Yes, but . . . You didn't do it. Well, when Mr. Giles finally surfaced, which was in his declaration, as someone that they actually used, he was never identified as a person they intended to use, but he was actually used, Discovery had been closed. Did you ask? Did you say, look, all of a sudden they're relying on him and we have this dispositive motion. We need either some time to track down Bouchard and see if we can just interview him. Did you ask for time regarding this issue? No, Your Honor. We challenged Mr. Giles' declaration in the briefing by moving to strike, and the court ignored that rule. Under Rule 26 was your theory. Rule 26A1, yes, Your Honor. But why do you even need his declaration? You have a document. The document is unsigned. It doesn't tell the whole story. We don't know what happened. Well, how do you respond? There's an Oklahoma Supreme Court case called Stewart v. Board of Education from 1924, and I quote, it is not always necessary that a written contract be signed by the parties to become a binding contract. Yes, and that decision, Your Honor, the court also found that there was a genuine issue of material fact. Well, but that was because there was a fuss between the school board and the teacher. I mean, those facts don't seem very relevant to the facts here. But the principle, I mean, if you're saying, well, it's not binding because your client didn't end up signing it, the Oklahoma Supreme Court says that's not necessary. In fact, your client could have said when it transmitted this offer to Mr. Stevens on March 30 of 2000 that this is not going to become final until it's signed by both parties. But your client didn't put that condition on its offer, did it? I would agree there's no condition, Your Honor. I just want to make sure that I understand your argument. You're arguing that the settlement document itself is invalid as not being the product of, that somehow or other that document does not stand as the memorialization of the agreement. You're not arguing that even if that document is seen as a valid settlement contract, agreed to by both, even if it's seen as a valid settlement contract, you're not saying even still that release either doesn't apply or it doesn't release this particular claim? No, we're not saying that. We're saying that there are genuine issues about whether or not there was a meeting of the minds with respect to that specific language, whether my clients agreed to that language. There are issues about whether or not they did. Okay, so then that's a little bit different of an answer. So you are saying that even if the court concludes that that document that was signed, that settlement document, is a contract, there's still the issue whether somehow that one provision was not the product of an agreement? No, I'm saying that we don't know if, based on the record, we don't know whether or not my clients agreed to the terms of that proposed settlement agreement. All of the terms? Yes. Okay, I'm trying to figure out if you're carving out the release. I'm not, and we're not taking the position that just that provision is invalid, and it's a very broad release, and we haven't briefed that issue. We haven't challenged the applicability. Okay, I understand. Thank you. I'm out of time. What evidence do you have in the record that would call that document into question? Because we all agree your client sent that document. Counsel for your client sent that document in his representative capacity for these parties. So what is in the record that calls that into question? Let me summarize them, Your Honor. Number one, there's no evidence in the record that we ever signed the agreement, that my clients ever approved that language. So you're claiming that your attorney sent, on behalf of your clients, a document that he was unauthorized to send? I'm saying we don't know. There's an issue, a genuine issue, material fact, on whether or not my clients approved that draft agreement. It was going back and forth between the lawyers. But there's nothing in the record to call his representative capacity into question? I agree with you. But your client maintains that they never saw it and never agreed to it. Well, no one testified they never saw it. But the deposition of one of the in-house counsel was taken, and the question was asked, what do you think was agreed to? And he said, we know we paid the $10,000. We know we agreed to dismiss the case. But beyond that, he didn't have any information on it. Did he call into question the representative capacity of his own counsel? He did not, Your Honor. And then what about, I think there's something in the record about your client's later request for a copy of the agreement, something about having lost it and wanting a copy from? I do recall that. I don't remember the specific context of that, but it does raise a final comment I'd like to make. None of the parties acted as if the release was signed. Even less than two years later, when my client's in-house counsel wrote Mr. Stevens and said, we think you're doing something wrong. He didn't rely on the release. He didn't say, I have a release. I can do whatever I want. He didn't say that. In fact, there are multiple references in the record. So it was an individual non-attorney did not make that response? His counsel responded, I believe. His counsel responded. The original response was not from Mr. Stevens himself? A non-attorney? I don't recall, Your Honor. The trial court ruled on that, and we think that was error as well. We briefed those issues. Thank you. Thank you. May it please the Court. Good morning. My name is Dean Amber. I'm representing SPE Wax Technologies. Here with me today is Steve Savastano. He's the owner of SPE Wax. Also Jerry McGlynn, one of my partners, and Rob Howard from Boss and Glazer, who is representing the other parties, Bruce Stevens and S&S Chemical. But I'm the only one that's going to be doing the talk. And time permitting, I'm going to talk about the three issues that they raised on appeal and certainly answer your questions to the best of my ability. But I really don't have time to go into, I think, what would be important background information, in a sense, to talk about the fact that there's no real good issues and no valid basis that this case should have been brought in the first place, including why we're talking about a 16-year-old agreement and a former employee that left employment at Baker in 1997. So I can only assure you, though, that those issues were briefed in two other summary judgment motions and can support there isn't any valid basis for any of Baker's claims. But let's go into the release agreement. You would have to admit that your opposing counsel finds himself in a gravely concerning position. There was a confidentiality agreement and then in a completely separate bit of litigation, somebody made the mistake of putting in a comprehensive mutual release that released their confidentiality rights. This is a... Is that not what the issue is before us? Yes, Your Honour. But also understand that if we delved into more of the background, and I don't really want to because we have important issues like this to talk about, I would explain the fact that our client or our former client, Bruce Stevens, independently developed his own process. I understand. All of those are obvious background issues. To us, the issue is not who blew it. Yes. The issue is what happened and what was settled. Right. So what is your argument in opposition to the opposing side's claim that there was no meeting of minds in this document? Well, clearly the strongest evidence that there was a meeting of the minds is the agreement itself, period. And that is because if you look at the agreement, it has the fax markings that show that it originated from Baker's attorney, and it was faxed over to Guile's, Bruce Stevens' attorney, who signed it, dated it, and then a few days later, on April 7th, sent it back to Baker's attorney. And from that date forward, they performed. Shortly thereafter. And also you have to put this in the context of the fact that these parties had been negotiating a settlement for a long period of time. I think maybe a year. I don't remember the earliest dates in the billing record. But it went back and forth for a long period of time. Do you know, I mean, do you claim and do you have evidence to support that they actually discussed a release? I do, based on the billing records. There's earlier entries that refer to drafts of a release and drafts of a settlement agreement. So obviously, and there's reference in the billing records to an agreement going back and forth. There were earlier drafts. There were exchanged between the attorneys. And then you see in the last entry, that coincides with the receipt of the final release agreement that was signed in return, you see an entry that says final agreement received and reviewed. And then it was signed and it was sent back. Why was it reviewed after it was sent back? Well, I think that's just typical attorney stuff in the sense that many times I look at an issue or I might look at a brief and then I might set it aside and then I might pick it up and look at it again. But I think the critical issue, Your Honor, I understand that point, is that it was faxed back and there is the marking on the document itself, three markings that show the progression of it being faxed. And the last one is April 7th. And the significance to that, of course, is that regardless of any discussion that occurred in between, the document was not modified other than the signature and the date being put on it, you know, March 31st, 2000. Otherwise, it was not modified between that time because you don't see any modification on it. They don't allege that it was modified. Right. But I'm talking about the review that came after. In terms of later on discussion, like the years later discussion about whether or not there was a release, I mean, the issue never came up, if I'm answering you. No, I thought that he had notes about reviewing it after. Yeah, I think what they're referring to, Your Honor. After he sent it back. Is the billing records, I think, refer to after. Yeah, see, after April 7th, the next entry says on April 14th. So April 7th is the date that it was sent back. And it just says, Review and approve last changes to release. Fax to attorney for Baker. And, again, the document itself bears witness to that fact, that that occurred. So then we have the next entry in the billing records, April 14th. It says, Legal work. Fax to Mr. Broussard, prompter regarding status of settlement. Prompter regarding status of settlement. And then next is, you know, 15th, draft motion to dismiss. 18th, receive and exchange documents. That's the performance that they did. So, I mean, that's all, it just all neatly falls. I'm sorry. Did the relationship with Mr. Giles continue? I mean, specifically, I'm asking when Baker was making these accusations about breach of the contract, I mean, did your client not know that he got a release? He didn't. It's really the bottom line. And the answer is no, Mr. Giles was not involved later on. He was not involved. And Mr. Giles did not have a copy of the release agreement. Because, you know, once they produced the copy to us, once Baker produced the copy that's in evidence and before the court, you know, we called up Giles and said, you know, do you have a copy of this? And his response was, we're talking about a 15-year-old document. I threw out, you know, all that stuff years ago. And we went back and forth a few times, and eventually he was able to somehow come up with his billing records. And I can't remember the full back story to that. But the bottom line is, he was not involved in anything later on. After he was, I think the client moved from Oklahoma to somewhere else as part of it, too. So later on, when Baker sent a letter saying, you know, we're reminding you of your obligations, almost two years later, Giles was not involved. And also, I just, you know, really briefly on that letter that they're referring to, it doesn't refer or reference in any manner, shape, or form the release agreement itself. So in other words, Baker isn't addressing the release agreement. But why would it? It's relying on the underlying agreement. Well, because if you're going to try to say, if they were going to try to make the argument that, you know, somehow this release agreement didn't apply, don't you think they would want to say that in the same letter that's providing somewhat of a warning? But they don't. How did you find out about it? I'm sorry? How did you find out about it? The later letter? No, the agreement. The release agreement? Yeah. Baker produced it in Discovery. Oh, it just was randomly produced. You didn't ask for it. Yeah, you know, and that's an interesting point, Your Honor, because we didn't specifically ask for the release agreement. We didn't know that they would have a release agreement. In fact, it wouldn't behoove them exactly to have it. But what we did ask for are all agreements, all agreements between the parties. And the reason is because they were alleging in the underlying case that there was breach of confidentiality agreements. So we wanted to see the full landscape of what they were going to allege to be all the agreements entered into between the parties. So I can only assume that it was in response to that request for production of documents that they produced the release agreement. They probably hated to produce it, right? Absolutely. But, you know, kind of the point there is, isn't that also somewhat of an admission that they recognized themselves that it was an agreement? I didn't say in a request, just, you know, give me every document that has anything to do with Stevens, because I would have ended up with, you know, he was an employee there for like 20 years. I mean, so, but, look, the bottom line is the agreement itself is the strongest evidence. But also there's their own admissions that you have to take into account in this discussion. And the fact that they admit that there was discussion between the parties, they admit that they sent over this agreement to Giles. They admit, and this is the most critical admission, that there was, that the parties did enter into an agreement. They did enter or have a meeting of the minds or a mutual assent to some agreement. That's part of their admission. Yeah, but they say they agreed back in January. They agreed to dismiss the case for 10 grand. That's the essence of the agreement. That's the part that they performed. And there's, you know, of course the fact that that is a typical progression of a case as in a settlement in principle, which is extremely common to do, to kind of have an understanding that we're going to agree on a number, but now we're going to go through the paperwork and get something finalized. And that's virtually the way every case works. And that's the way that it worked in this case. But the important thing is, understand, Your Honor, is that they don't come forward with any evidence whatsoever of any other agreement. So they admit that there was a meeting of the minds or a mutual assent to some contract. So what is that other contract? What does it say? What does it provide? And I deposed, and we had a Rule 30b-6 deposition, and they produced one of their in-house attorneys, who was actually no longer an employee at the time, but he was the one that was proffered by them. And he was asked the question, well, if you say this isn't the contract, what's the contract? And then, you know, he doesn't know. Well, do you have any evidence of facts supporting that there was this other contract? His answer is no. So they – That was when Giles, is that how – Giles is how he pronounces his name? That's when Giles' name came up in the deposition? Your arguments, your briefing indicates that even if you didn't give them this information, Giles' name or his billing records, directly, that they had notice of it. So they make an argument under the rule that you should have declared him. So explain why he wasn't named and declared as a witness. And there's a – thank you, Your Honor, for that opportunity. The bottom line is we complied with Rule 2060, and we did it in a very strong way by attaching to our answer to Baker's second amended complaint, the release agreement, and in our affirmative defenses, we had a paragraph stating why the release agreement released all of the claims in the case. And we attached the agreement. It was the only thing that was attached to our answer to the second amended complaint. And the only identified – there's four individuals identified on that agreement, including Broussard and Giles and Stevens and one of their in-house attorneys, I think Jeff Schenck. So there's only four names on this agreement. How far from the close of discovery was that deposition? It was – well, our answer to their second amended complaint, where we attached the release, was 10 weeks before the end of discovery, which was July 30th. So it was 10 weeks. And another kind of important point on that, if I may, is that after we provided the answer with the release agreement attached, they took the deposition of Bruce Stevens, the target defendant, one of the people that had his name on the agreement. And that's actually in the record. But what they did is astounding. They did nothing to discuss the agreement directly. They only made indirect reference to it. They talked about 30 different documents during seven hours of testimony, and they never handed Mr. Stevens directly the release agreement and said, you know, can you prove or vouch or what's your support that this is the agreement between the parties? They avoided the issue. I can't help but think that I wonder if this is sort of a case of bad lawyering here, where this release was sort of boilerplate thrown into the settlement of the little salary dispute and nobody thought about what effect it would have on the confidentiality agreement that had been signed when he left employment. But it's in there. Well, you know, that's a fair point, Your Honor, that it may have been perhaps not the best situation for them, but understand that at the time that they had this dispute, they were both, Stevens was suing them for a legitimate beef, a legitimate claim of failure to pay based on this severance. And so it was in Baker's best interest to have a release. And obviously it was in Stevens' best interest to have a release as well and not have them come back against him later on. So, I mean, it's actually, I don't know if it's bad lawyering or if it's good lawyering on the part of Mr. Stevens. Assembly Baker, if they had thought about it, would have carved out, well, this release doesn't release your agreement to maintain trade secrets. Well, I think they just recognized that it was time to sever the relationship. This was, I think, what about, say, four years after Stevens had left the employment, somewhere in that ballpark. So they were at a point where it was the appropriate thing to do. They might be begging to differ now. But they don't maintain, nobody's claiming, Baker's not claiming this was a mutual mistake to include the release. I mean, they're not arguing that. They're just challenging whether there was a true offer and acceptance and meeting of the minds for the contract. And that's sort of where we are, right? Yes, Your Honor, and we would respectfully suggest that there is very strong evidence that the only evidence supports that there was a meeting of the minds. Has your client made any statements under oath in this litigation regarding his understanding that he was getting a release? Well, as I mentioned, Your Honor, he was deposed two weeks after, approximately, we produced the release. And the only reference in that deposition, and I want to be careful about stating because I won't be able to state it verbatim, but he was indirectly asked about the release. And he said, basically, look, I'm not an attorney. I don't know what was agreed to. And the attorney for Baker never further explored it. He never got out the agreement. He never talked about guiles. He never went through the details. He never asked him to concede that he still owed a duty of confidentiality. Right. He never went through and did that. And, you know, Mr. Stevens basically deflected by stating, you know, I'm not an attorney. I don't know what a release is, to that effect. So I would respectfully request, I see I'm out of time, that this honorable court affirm the district court's decision, because it was the right decision. Thank you very much. Thank you. The case will be submitted.